**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| JESSICA MENDOZA, derivatively on behalf of CHARLES RIVER LABORATORIES INTERNATIONAL, INC., | Case No. |
| Plaintiff, | |
| v. | |
| JAMES C. FOSTER, DAVID R. SMITH, FLAVIA PEASE, NANCY C. ANDREWS, ROBERT J. BERTOLINI, DEBORAH T. KOCHEVAR, GEORGE LLADO, MARTIN MACKAY, GEORGE E. MASSARO, C. RICHARD REESE, CRAIG B. THOMPSON, RICHARD F. WALLMAN, and VIRGINIA M. WILSON, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| CHARLES RIVER LABORATORIES INTERNATIONAL, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Jessica Mendoza ("Plaintiff"), by and through her undersigned attorneys, derivatively and on behalf of Nominal Defendant Charles River Laboratories International, Inc. ("Charles River" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants James C. Foster ("Foster"), David R. Smith ("Smith"), Flavia Pease ("Pease"), Nancy C. Andrews ("Andrews"), Robert J. Bertolini ("Bertolini"), Deborah T. Kochevar ("Kochevar"),

George Llado ("Llado"), Martin Mackay ("Mackay"), George E. Massaro ("Massaro"), C. Richard Reese ("Reese"), Craig B. Thompson ("Thompson"), Richard F. Wallman ("Wallman", and Virginia M. Wilson ("Wilson ") (collectively, the "Individual Defendants" and together with Charles River, "Defendants"), for and among other things, breaching their fiduciary duties to Charles River stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and violating the federal securities laws.

As for Plaintiff's complaint against Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Charles River, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought against the members of Charles River's Board of Directors (the "Board") for their breaches of fiduciary duty, violations of the federal securities laws, and other misconduct, which occurred between May 5, 2020 and February 21, 2023 (the "Relevant Period"), and which resulted in substantial damage to Charles River and its stockholders.

2.     Charles River is a full-service, non-clinical global drug development partner with a mission to create healthier lives. The Company has three reporting segments: Research Models and Services; Discovery and Safety Assessment; and Manufacturing Solutions. The Discovery and

Safety Assessment segment accounts for approximately 60% of the Company's total revenue and offers, among other things, safety assessment studies required for regulatory submission of therapeutic solutions.

3.     On February 22, 2023, before the market opened, Charles River revealed that it had received a subpoena from the U.S. Department of Justice ("DOJ") relating to an ongoing investigation in conjunction with the U.S. Fish and Wildlife Service ("USFWS") into the supply chain and illegal importation of non-human primates for research. The Company noted that it was voluntarily suspending shipments of primates from Cambodia, which would negatively impact its earnings for the year and would reduce revenue growth by 200 basis points to 400 basis points.

4.     On this news, Charles River's stock price fell $24.51, or 10%, to close at $219.09 per share on February 22, 2023, on unusually heavy trading volume.

5.     Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties to Charles River by personally making and/or causing Charles River to make materially false and/or misleading statements, as well as failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused Charles River to make false and misleading statements that failed to disclose to investors that: (1) Charles River had engaged in illegal activity with respect to its importation of non-human primates for research; (2) as a result, Charles River was at a heightened risk of criminal and regulatory investigation by, *inter alia*, the DOJ; and (3) as a result, Charles River would be forced to suspend shipments of primates from Cambodia. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain an adequate system of oversight and disclosure controls and procedures.

7.     In light of the Individual Defendants' misconduct, which has resulted in the Company, its Chief Executive Officer ("CEO"), and its current and former Chief Financial Officers ("CFO") being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action"), and that has further subjected Charles River to the need to undertake internal investigations and the need to implement adequate internal controls—Charles River will have to expend significant sums of money.

8.     Charles River has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct. As a result of the Individual Defendants' wrongful acts and omissions and breaches of fiduciary duties, the filing of the Securities Class Action, and the decline in the market value of the Company's securities, Charles River has suffered significant losses and damages.

9.     Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this action, Charles River will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 27 of the Securities Exchange Act of 1934 ("Exchange Ac"), 15 U.S.C. §78aa, because Plaintiff's claims

raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule

10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

11.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

12.    This derivative action is not a collusive action designed to confer jurisdiction on a

court of the United States that it would not otherwise have.

13.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a

substantial portion of the transactions and wrongs complained of herein occurred in this District,

Charles River is incorporated in the District, the Defendants have conducted business in this

District, and Defendants' actions have had an effect in this District.

## **PARTIES**

14.    Plaintiff is a current Charles River stockholder who has continuously held Charles

River stock at all relevant times.

15.    Nominal Defendant Charles River is incorporated in Delaware with its principal

executive offices located in Wilmington, Massachusetts. Charles River's shares trade on the New

York Stock Exchange ("NYSE") under the ticker symbol "CRL."

16.    Defendant Foster served as the Company's CEO at all relevant times. In addition,

Defendant Foster has served as the Company's Chairman of the Board since 2000 and President

since 1992. In 2022, Defendant Foster received compensation totaling $13,447,872 from Charles

River.

17.    Defendant Smith served as the Company's CFO from August 2015 until May 2022.

In 2022, Defendant Smith received compensation totaling $3,611,028 from Charles River.

18.     Defendant Pease has served as the Company's CFO since May 2022. In 2022, Defendant Pease received compensation totaling $4,484,150 from Charles River.

19.     Defendant Andrews has been a director of Charles River since 2020. Defendant Andrews is the Chair of the Science and Technology Committee ("Science Committee") and is a member of the Governance and Nominating Committee ("Governance Committee") and the Responsible Animal Use Committee ("Animal Committee"). In 2022, Defendant Andrews received compensation totaling $337,426 for serving as a Charles River director.

20.     Defendant Bertolini has been a director of Charles River since 2011. Defendant Bertolini serves as Chair of the Strategic Planning and Capital Allocation Committee ("Planning Committee") and is a member of the Audit Committee. In 2022, Defendant Bertolini received compensation totaling $343,676 for serving as a Charles River director.

21.     Defendant Kochevar has been a director of Charles River since 2008. Defendant Kochevar serves as Chair of the Governance Committee and is a member of both the Science Committee and the Animal Committee. In 2022, Defendant Kochevar received compensation totaling $333,676 for serving as a Charles River director.

22.     Defendant Llado has been a director of Charles River since October 2020. Defendant Llado serves as a member of the Governance Committee, the Science Committee, and the Audit Committee. In 2022, Defendant Llado received compensation totaling $318,676 for serving as a Charles River director.

23.     Defendant Mackay has been a director of Charles River since 2017. Defendant Mackay serves as Chair of the Animal Committee and is a member of both the Science Committee and the Finance Committee. In 2022, Defendant Mackay received compensation totaling $329,772 for serving as a Charles River director.

24.     Defendant Massaro has been a director of Charles River since 2003. Defendant Massaro is a member of both the Audit Committee and the Compensation Committee. In 2022, Defendant Massaro received compensation totaling $368,676 for serving as a Charles River director.

25.     Defendant Reese has served as a director of the Company since 2007. Defendant Reese serves as Chair of the Compensation Committee and is a member of the Planning Committee. In 2022, Defendant Reese received compensation totaling $338,676 for serving as a Charles River director.

26.     Defendant Thompson has been a director of Charles River since December 2022. Defendant Thompson is a member of the Planning Committee, the Science Committee, and the Animal Committee.

27.     Defendant Wallman has been a director of the Company since 2011. Defendant Wallman serves as Chair of the Finance Committee and is a member of both the Compensation Committee and the Planning Committee. In 2022, Defendant Wallman received compensation totaling $333,676 for serving as a Charles River director.

28.     Defendant Wilson has been a director of Charles River since 2019. Defendant Wilson serves as Chair of the Audit Committee and is a member of both the Governance Committee and the Compensation Committee. In 2022, Defendant Wilson received compensation totaling $343,676 for serving as a Charles River director.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

29.      By reason of their positions as officers, directors, and/or fiduciaries of Charles River, and because of their ability to control the business and corporate affairs of Charles River, the Individual Defendants owed Charles River and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control

and manage Charles River in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Charles River and its shareholders.

30.     Each director and officer of the Company owes to Charles River and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.     The Individual Defendants, due to their positions of control and authority as directors and/or officers of Charles River, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of Charles River were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

34.     The Individual Defendants' conduct complained of herein involves issuance of false and misleading statements, a knowing and culpable violation of their obligations as directors and/or officers of Charles River, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35.     The Individual Defendants were officers and directors of the Company, and their conduct has been ratified by the remaining Individual Defendants who collectively comprised Charles River's Board at relevant times. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Charles River to issue false and misleading statements of material fact in the Company's statements relating to the Company's prospects and failed to protect corporate assets.

36.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

37.     To discharge their duties, the officers and directors of Charles River were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Charles River were required to, among other things:

(a)     Ensure that Charles River was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Charles River's own Code of Business Conduct and Ethics;

(b)    Conduct Charles River's affairs in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Remain informed as to how Charles River conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Charles River and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Charles River's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38.     The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Charles River.

39.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Charles River and were at all times acting within the course and scope of such agency.

40.     In addition, the Individual Defendants' actions and conduct has subjected the Company to at least the Securities Class Action. Further, the Individual Defendants' actions caused Charles River to suffer severe reputational harm. As a result, Charles River has expended, and will continue to expend, substantial sums of money to rectify the Individual Defendants' wrongdoing as well as the potential lost business and impaired goodwill.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that caused the Company to issue false and misleading statements of material fact that failed to disclose and misrepresented adverse facts that were known to the Individual Defendants or were recklessly disregarded by them at the time they were made, including that Charles River had: (1) engaged in illegal activity with respect to its importation of non-human primates for research; (2)  that, as a result, Charles River was at a heightened risk of criminal and regulatory investigation by, *inter alia*, the DOJ; and (3) that, as a result, Charles River

11

would be forced to suspend shipments of primates from Cambodia. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

43.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused Charles River to make false and misleading statements in the Company's statements relating to Charles River's illegal activity with respect to the importation of non-human primates and the related DOJ investigation into the Company.

44.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) disguise and misrepresent the valuation of the Company; and (2) artificially inflate the Company stock price.

45.     Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

47.     During the times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Charles River and was acting within the course and scope of such agency.

## **CODE OF BUSINESS CONDUCT AND ETHICS**

48.     The conduct of all the Company's officers, directors, and employees is governed by its Code of Business Conduct and Ethics (the "Code of Conduct").

49.     As part of its introduction, the Code of Conduct includes a message that is signed by Defendant Foster and reads, in pertinent part, as follows:

> The continued success of our Company depends on each of us and our shared commitment to ethical business practices across the globe. By following both the letter and the spirit of applicable laws, and acting with integrity, we will meet the expectations of our clients, attract and retain outstanding employees, and deliver value to our shareholders.

50.     The Code of Conduct then confirms that all Company employees, including officers and directors, as well as all suppliers, vendors, and business partners, are expected to abide by the Code of Conduct, stating in pertinent part:

> The Code applies to all **employees, officers and directors** of Charles River. It also applies to our **consultants and agents** in the work they do for the Company. In addition, we expect our **suppliers, vendors, and other business partners** to comply with the high ethical and legal standards described in the Code, as well as those described in our Supplier Code of Conduct.

51.     In a section titled "What Happens When Someone Violates the Code", the Code of Conduct states that: "Anyone who violates the Code may be subject to disciplinary action, up to and including termination of employment. In some situations, violations may also result in civil or criminal penalties for you, your manager and/or the Company."

52.     A later section of the Code of Conduct is titled "Understanding the Laws and Policies Relating to the Animals in Our Care", which reads as follows:

> We are committed to compliance with both the letter and spirit of the laws and regulations relating to the care and use of research animals and to the other services and products we offer to support the activities of our clients. Since we operate in a highly regulated environment, we must all be vigilant in meeting and going beyond our responsibilities to comply with relevant laws and regulations and in complying with all applicable policies and operating procedures.

53.     The Code of Conduct also contains a section titled "Protecting Our Reputation with Accurate Communications", which reads, in pertinent part:

> Our reputation is one of our most valuable assets. Each of us must strive to protect and enhance our Company's reputation in all that we do. Our filings and disclosures that we make to the public about our business performance and financial results, including our filings with regulatory authorities (such as the U.S. Securities and Exchange Commission) must be full, fair, accurate, timely and understandable. We must not mislead the government, our clients, our investors or the public. Employees who have a role in preparing our public disclosures and our filings with regulatory authorities have a special responsibility to help us meet these standards.

54.     In a later subsection of the same section, titled "Complying with International Trade Requirements", the Code of Conduct states:

> The laws governing global trade practices are complex and subject to frequent change. As a global business, Charles River must comply with international agreements and conventions, as well as the national, regional and local laws and regulations that apply to our international business. Each of us must also follow all Company policies and procedures when conducting business across jurisdictions, including:
>
> - Maintaining required certifications, standards, procedures and other documentation
> - Properly classifying and recording all imported or exported goods, services, and technology
> - Complying with laws and regulations governing the importing or exporting of goods, services and technology including obtaining appropriate licenses
> - Furnishing accurate and complete information to any customs officials or anyone we engage to facilitate our imports and exports, including accurate payment of customs duties and taxes
>
> The Company is also subject to laws that prohibit transactions with certain counties, organizations or people, and laws concerning our participating in international boycotts.

55.     In violation of the Code of Conduct, the Individual Defendants (as officers of Charles River and/or as members of the Board) disregarded their duties to prevent the Company from making false and misleading statements, to maintain adequate internal controls, to protect corporate assets, and to protect animal welfare to comply with laws and regulations. The Individual

14

Defendants' complete failure to perform their duties in good faith resulted in misrepresentations to the investing public and the Company's shareholders, and in engagement in conduct that was not in the best interest of the Company.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Relevant Period

### May 7, 2020 Form 10-Q

56.     On May 7, 2020, the Company filed its Form 10-Q with the SEC for the quarter ended March 28, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2022 ("SOX") signed by Defendants Foster and Smith attesting the accuracy of the 1Q20 10-Q.   The 1Q20 10-Q, also signed by Defendants Foster and Smith, discussed Charles River's compliance with regulations, stating in relevant part:

> ***Any failure by us to comply with applicable regulations and related guidance could harm our reputation and operating results, and compliance with new regulations and guidance may result in additional costs.***
>
> Any failure on our part to comply with applicable regulations could result in the termination of ongoing research or the disqualification of data for submission on behalf of our clients to regulatory authorities. This could harm our reputation, our prospects for future work and our operating results. For example, the issuance of a notice of objectionable observations or a warning letter from the FDA based on a finding of a material violation affecting data integrity by us for GLP or cGMP requirements that are not addressed to the regulatory monitoring authorities' satisfaction could materially and adversely affect us. If our operations are found to violate any applicable law or other governmental regulations, we might be subject to civil and criminal penalties, damages and fines or the temporary closure of our facilities. Any action against us for violation of these laws or regulations, even if we successfully defend against it, could cause us to incur significant legal expenses, divert our management's attention from the operation of our business and damage our reputation.
>
> In addition, regulations and guidance worldwide concerning the production and use of research animals for research purposes continue to evolve. Similarly, guidance has been and continues to be developed for other areas that impact the biomedical research community on both a national and international basis including

transportation, mandated contingency planning, euthanasia guidance, import and export requirements of biological materials, health monitoring requirements and the use of disinfectants.

57.    The 1Q20 10-Q continued to discuss the Company's compliance with laws and

regulations, stating in part:

Although we believe we are currently in compliance in all material respects with applicable national, regional and local laws, as well as other accepted guidance used by oversight bodies (including the USDA, the standards set by the International Air Transport Association, the Convention on International Trade in Endangered Species of Wild Fauna and Flora, U.S. Fish and Wildlife Service, The Centers for Disease Control, the Department of Transportation, the Department of State, the office of Laboratory Animal Welfare of NIH, the Drug Enforcement Agency, as well as numerous other oversight agencies in the jurisdictions in which we operate), failure to comply could subject us to denial of the right to conduct business, fines, criminal penalties and other enforcement actions. In addition, if regulatory authorities were to mandate a significant reduction in safety assessment procedures that utilize laboratory animals (as has been advocated by certain groups), certain segments of our business could be materially adversely affected.

58.    The 1Q20 10-Q also addressed the following risk related to the supply of large

research models or research animals:

***Several of our product and service offerings are dependent on a limited source of supply that, when interrupted, adversely affects our business.***

We depend on a limited international source of supply for certain products, such as large research models. Disruptions to their continued supply from time to time arise from health problems (including as a result of the COVID-19 pandemic and the spread of other diseases), export or import laws/restrictions or embargoes, tariffs, international trade regulations, foreign government or economic instability, severe weather conditions, increased competition among suppliers for models, disruptions to the air travel system, activist campaigns, commercial disputes, supplier insolvency, geopolitical disputes, measures intended to slow the spread of COVID-19 or other ordinary course or unanticipated events. Any disruption of supply could materially harm our business if we cannot remove the disruption or are unable to secure an alternative or secondary supply source on comparable commercial terms. For example, as with other industry participants, certain of our activities rely on a sufficient supply of large research models, which has seen increasing demand as compared to supply in 2020 due to a variety of factors. First, the surge of research relating to COVID-19 has increased short term demand. Second, China supplies a significant portion of certain critical large research models, which have been subject to geographic export restrictions applicable to many animal species since

16

the beginning of the COVID-19 pandemic. While we continue to take steps to find alternative supply channels and lock in supply with preferred sources through multi-year and/or minimum commitment contracts, such mitigating efforts may not prove successful at ensuring a steady and timely supply or may require (and in the past have required) us to pay significantly higher prices for such products during periods of global shortage or restrictions on the transportation of products. In addition, limited global supply or regional restrictions on transportation for certain products may require us to source products from non-preferred vendors.

**February 17, 2021 Form 10-K**

59.    On February 17, 2021, the Company filed its Form 10-K with the SEC for the fiscal year ended December 26, 2020 ("2020 10-K"). The 2020 10-K was signed by Defendants Foster, Smith, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Reese, Wallman, and Wilson. The 2020 10-K also contained signed SOX certifications by Defendants Foster and Smith attesting to the accuracy of the 2020 10-K.

60.    The 2020 10-K contained a risk disclosure stating,  "Any failure by us to comply with applicable regulations and related guidance could harm our reputation and operating results, and compliance with new regulations and guidance may result in additional costs." The 2020 10-K continued, in part:

> Although we believe we are currently in compliance in all material respects with applicable national, regional and local laws, as well as other accepted guidance used by oversight bodies (including the USDA, the standards set by the International Air Transport Association, the Convention on International Trade in Endangered Species of Wild Fauna and Flora, U.S. Fish and Wildlife Service, The Centers for Disease Control, the Department of Transportation, the Department of State, the office of Laboratory Animal Welfare of NIH, the Drug Enforcement Agency, as well as numerous other oversight agencies in the jurisdictions in which we operate), failure to comply could subject us to denial of the right to conduct business, fines, criminal penalties and other enforcement actions. In addition, if regulatory authorities were to mandate a significant reduction in safety assessment procedures that utilize laboratory animals (as has been advocated by certain groups), certain segments of our business could be materially adversely affected.

**February 16, 2022 Form 10-K**

61.     On February 16, 2022, the Company filed its Form 10-K with the SEC for the fiscal year ended December 25, 2021 ("2021 10-K"). The 2021 10-K was signed by Defendants Foster, Smith, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Reese, Wallman, and Wilson. The 2021 10-K also contained signed SOX certifications by Defendants Foster and Smith attesting to the accuracy of the 2021 10-K.

62.     The 2021 10-K again discussed Charles River's compliance with law and regulations, stating in part:

> Although we believe we are currently in compliance in all material respects with applicable national, regional and local laws, as well as other accepted guidance used by oversight bodies (including the USDA, the standards set by the International Air Transport Association, the Convention on International Trade in Endangered Species of Wild Fauna and Flora, U.S. Fish and Wildlife Service, The Centers for Disease Control, the Department of Transportation, the Department of State, the office of Laboratory Animal Welfare of NIH, the Drug Enforcement Agency, as well as numerous other oversight agencies in the jurisdictions in which we operate), failure to comply could subject us to denial of the right to conduct business, fines, criminal penalties and other enforcement actions. In addition, if regulatory authorities were to mandate a significant reduction in safety assessment procedures that utilize research animals (as has been advocated by certain groups), certain segments of our business could be materially adversely affected.

63.     The above statements identified in ¶¶ 56-62 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) Charles River had engaged in illegal activity with respect to its importation of non-human primates for research; (2) as a result, Charles River was at a heightened risk of criminal and regulatory investigation by, *inter alia*, the DOJ; (3) as a result, Charles River would be forced to suspend shipments of primates from Cambodia; and (4) as a result of the foregoing, Defendants' positive statements about the

18

Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## The Truth Emerges

64.     On February 22, 2023, before the market opened, Charles River filed a Form 8-K, attaching a press release announcing its fourth quarter and full year 2022 financial results. The press release disclosed that the Company  received a subpoena from the DOJ relating to an ongoing investigation in conjunction with the USFWS into the supply chain and illegal importation of non-human primates for research, stating in part:

### U.S. Department of Justice Investigation into Non-Human Primate Supply Chain

On February 17th, the Company received a subpoena from the U.S. Department of Justice relating to an investigation into the Cambodian non-human primate (NHP) supply chain. The Company has been informed that this investigation relates specifically to several shipments of NHPs received by Charles River from its Cambodian supplier. Charles River intends to fully cooperate with the U.S. government as part of their investigation. Due to ongoing investigations and the heightened focus on the Cambodian NHP supply chain in recent months, Charles River has voluntarily suspended NHP shipments from Cambodia at this time.

65.     The same day, Charles River filed its annual report on Form 10-K for the period ended December 31, 2022 ("2022 10-K"), which provided further detail on the DOJ subpoena, stating in part:

On February 16, 2023, the Company was informed by the U.S. Department of Justice (DOJ) that in conjunction with the U.S. Fish and Wildlife Service (USFWS), it had commenced an investigation into the Company's conduct regarding several shipments of non-human primates from Cambodia. On February 17, 2023 the Company received a grand jury subpoena requesting certain documents related to such investigation. The Company is aware of a parallel civil investigation being undertaken by the DOJ and USFWS. The Company is cooperating with the DOJ and the USFWS and believes that the concerns raised with respect to the Company's conduct are without merit. The Company maintains a global supplier onboarding and oversight program incorporating risk-based due diligence, auditing, and monitoring practices to help ensure the quality of our supplier relationships and compliance with applicable U.S. and international laws and regulations, and has

operated under the belief that all shipments of non-human primates it received satisfied the material requirements, documentation and related processes and procedures of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) documentation and related processes and procedures, which guides the release of each import by USFWS. Notwithstanding our efforts and good-faith belief, in connection with the civil investigation, the Company has voluntarily suspended future shipments of non-human primates from Cambodia until such time that the Company and USFWS can agree upon and implement additional procedures to reasonably ensure that non-human primates imported to the United States from Cambodia are purpose-bred. While these discussions with USFWS are ongoing, the Company has also agreed to continue to care for the Cambodia-sourced non-human primates from certain recent shipments that are now in the United States. We are not able to predict what action, if any, might be taken in the future by the DOJ, USFWS or other governmental authorities as a result of the investigations. Neither the DOJ nor USFWS has provided the Company with any specific timeline or indication as to when these investigations or discussions regarding future processes and procedures will be concluded or resolved. Because it is in the early stages, the Company cannot predict the timing, outcome or possible impact of the investigations, including without limitation any potential fines, penalties or liabilities.

66.     That same day, during an earnings call with investors, Defendant Foster discussed non-human primate ("NHP") supply chain, stating that the "investigation into the current NHP supply situation will result in study delays in our Safety Assessment business." He further stated that the investigation into the Cambodian NHP supply chain would reduce the annual revenue forecast by approximately 200 basis points to 400 basis points, stating in part:

The current Cambodian NHP supply constraints and the corresponding impact to our Safety Assessment business are expected to reduce our consolidated revenue growth forecast by approximately 200 basis points to 400 basis points this year, resulting in organic revenue growth guidance of 4.5% to 7.5% for the total company.

The non-GAAP earnings per share are expected to be in a range of $9.70 to $10.90 in 2023 with the wider ranges encompassing a number of scenarios related to the timing of the resumption of Cambodian NHP imports this year. The top end of our guidance ranges anticipate that we will have Cambodian NHPs available for studies in the fourth quarter, whereas the bottom end of our guidance assumes that we will have no Cambodian NHP imports for the remainder of 2023. In either case, we expect to begin to experience a more meaningful impact from NHP supply constraints in the second quarter.

20

67. On this news, Charles River's stock price fell $24.51, or 10%, to close at $219.09 per share on February 22, 2023, on unusually heavy trading volume.

68. On March 1, 2023, *The Washington Post* published an article linking the investigation to a November 2022 indictment of a monkey-smuggling ring. The article stated, in relevant part:

> Cambodia has emerged as the largest international source of monkeys used in U.S. research, after China stopped exporting primates during the pandemic. Imported monkeys must meet various international and U.S. regulatory requirements. The investigation into Cambodian monkeys centers on the question of whether they were bred in captivity, as permits stated.
>
> In November, eight people, including two Cambodian government officials, were indicted on charges of allegedly capturing wild long-tailed macaques, which are endangered, from national parks and protected areas and falsifying permits amid a shortage of monkeys at the breeding facilities. As the investigation continues, shipments of primates from Cambodia have been paused.
>
> *          *          *
>
> Contract research organizations, such as Charles River Laboratories International, Inotiv and Laboratory Corporation of America, provide primates to drug companies as well as academic and government scientists, and they rely on multiple sources, including international suppliers.

## DAMAGES TO CHARLES RIVER

69. As a direct and proximate result of the Individual Defendants' conduct, Charles River has expended and will continue to expend significant sums of money.

70. Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action filed against the Company for violations of the federal securities laws. Charles River will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

21

71.     As a direct and proximate result of the Individual Defendants' conduct, Charles River has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

**PLAINTIFF'S DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

72.     Plaintiff brings this action derivatively and for the benefit of Charles River to redress injuries the Company suffered and will suffer as a direct result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Charles River. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

73.     Plaintiff has continuously been a stockholder of Charles River at all relevant times. Plaintiff will adequately and fairly represent the interests of Charles River in enforcing and prosecuting its rights.

74.     A pre-suit demand on the Board of Charles River is futile, and therefore, excused. At the time of filing this action, Charles River's Board consists of the following eleven individuals: Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Reese, Thompson, Wallman, and Wilson (collectively, the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the eleven Director-Defendants that are on the Board at the time this action is commenced.

75.     Demand is excused as to all of the Director-Defendants as each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially

investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

76.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, demand would be futile, and thus is excused, as the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

77.     The Director-Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director-Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs.

78.     Additionally, the Director-Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

79.     Each of the Director-Defendants authorized, signed, and/or permitted the false statements, including the 2021 10-K and 2022 10-K, to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

80.     The Director-Defendants, as members of the Board, were and are subject to Charles River's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties

required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director-Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director-Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

81.     Defendant Foster is the Chairman of the Company's Board, as well as its President and CEO. Defendant Foster began his career at Charles River in 1976, was named President in 1991, CEO in 1992, and Chairman in 2000. He has been a director since before the Relevant Period. The Company provides Defendant Foster with his principal occupation for which he receives significant compensation as detailed above. The Company's most recently Proxy Statement, filed on Form DEF 14A on March 30, 2023 with the SEC ("2023 Proxy Statement") admits that Defendant Foster is not independent. As such, Defendant Foster cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Foster renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

82.     As Chairman of the Board, Defendant Foster is ultimately responsible for the Company's operations, internal controls, and false and misleading statements and omissions made during the Relevant Period. As the Company's highest officer and as a trusted Board member, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect

corporate assets. Furthermore, Defendant Foster is a defendant in the Securities Class Action. As a result, Defendant Foster breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Foster is futile and excused.

83.     Defendant Andrews has served as a Company director since 2020. The Company provides Defendant Andrews with significant compensation for her role as a director as detailed above. As such, Defendant Andrews cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Andrews renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Andrews breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Andrews is futile and excused.

84.     Defendant Bertolini has served as a Company director since 2011. The Company provides Defendant Bertolini with significant compensation for his role as a director as detailed above. As such, Defendant Bertolini cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Bertolini renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight

of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Bertolini breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Bertolini is futile and excused.

85.     Defendant Kochevar has served as a Company director since 2008. The Company provides Defendant Kochevar with significant compensation for her role as a director as detailed above. As such, Defendant Kochevar cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Kochevar renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Kochevar breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Kochevar is futile and excused.

86.     Defendant Llado has served as a Company director since October 2020. The Company provides Defendant Llado with significant compensation for his role as a director as detailed above. As such, Defendant Llado cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Llado renders him incapable of impartially considering a demand to commence and

vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Llado breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Llado is futile and excused.

87.     Defendant Mackay has served as a Company director since 2017. The Company provides Defendant Mackay with significant compensation for his role as a director as detailed above. As such, Defendant Mackay cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Mackay renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. The 2023 Proxy Statement admits that Defendant Mackay is not independent Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Mackay breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Mackay is futile and excused.

88.     Defendant Massaro has served as a Company director since 2002. The Company provides Defendant Massaro with significant compensation for his role as a director as detailed above. As such, Defendant Massaro cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and

threaten his livelihood. This lack of independence and the financial benefits received by Defendant Massaro renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Massaro breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Massaro is futile and excused.

89.     Defendant Reese has served as a Company director since 2007. The Company provides Defendant Reese with significant compensation for his role as a director as detailed above. As such, Defendant Reese cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Reese renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Reese breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Reese is futile and excused.

90.     Defendant Thompson has served as a Company director since December 2022. The Company provides Defendant Thompson with compensation for his role as a director. As such, Defendant Thompson cannot independently consider any demand to sue himself for breaching his

fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Thompson renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Thompson is futile and excused.

91.    Defendant Wallman has served as a Company director since 2011. The Company provides Defendant Wallman with significant compensation for his role as a director as detailed above. As such, Defendant Wallman cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Wallman renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Wallman breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Wallman is futile and excused.

92.    Defendant Wilson has served as a Company director since 2019. The Company provides Defendant Wilson with significant compensation for her role as a director as detailed

above. As such, Defendant Wilson cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Wilson renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Wilson breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Wilson is futile and excused.

93.     Charles River has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Charles River any part of the damages Charles River suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

94.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was

based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

95.     The acts complained of herein constitute violations of fiduciary duties owed by Charles River's officers and directors, and these acts are incapable of ratification.

96.     Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Therefore, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants For Violations of §10(b) of the Exchange Act, 15 U.S.C.
§ 78(j), and Rule 10b-5, 17 C.F.R. §240.10b-5**

97.     Plaintiff repeats and realleges each and every allegation contained above as if fully
set forth herein.

98.     The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C.
§ 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

99.     The Individual Defendants, individually and in concert, directly or indirectly,
disseminated or approved the materially false statements specified above, which they knew or
deliberately disregarded were misleading in that they contained misrepresentations and failed to
disclose material facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading.

100.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule
10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue
statements of material facts or omitted to state material facts necessary in order to make the
statements made, in light of the circumstances under which they were made, not misleading; or
(iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon
Plaintiff and others similarly situated.

101.    The Individual Defendants acted with scienter because they: (i) knew that the public
documents and statements issued or disseminated in the name of Charles River were materially
false and misleading; (ii) knew that such statements or documents would be issued or disseminated
to the investing public; and (iii) knowingly and substantially participated or acquiesced in the
issuance or dissemination of such statements or documents as primary violations of the securities
laws.

102.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Charles River, their control over, and/or receipt and/or modification of Charles River's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Charles River, participated in the fraudulent scheme alleged herein.

103.    As a result of the foregoing, the market price of Charles River common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Charles River common stock in purchasing Charles River common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

104.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## SECOND CLAIM

### Against the Individual Defendants For Breach of Fiduciary Duties

105.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

106.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Charles River's business and affairs.

107.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

108.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Charles River.

109.    In breach of the fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

110.    In further breach of their fiduciary duties owed to Charles River, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) that Charles River had engaged in illegal activity with respect to its importation of non-human primates for research; (2) as a result, Charles River was at a heightened risk of criminal and regulatory investigation by, *inter alia*, the DOJ; (3) as a result, Charles River would be forced to suspend shipments of primates from Cambodia. As a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

111.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

112.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public

statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

113.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

114.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

115.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Charles River has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## **THIRD CLAIM**

### **Against the Individual Defendants for Abuse of Control**

116.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

117.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Charles River, for which they are legally responsible.

118.    As a direct and proximate result of the Individual Defendants' abuse of control, Charles River has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Charles River has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

119.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

120.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Charles River in a manner consistent with the operations of a publicly-held corporation.

121.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Charles River has sustained and will continue to sustain significant damages.

122.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

123.    Plaintiff on behalf of Charles River has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

124.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

125.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

126.    The Individual Defendants wasted corporate assets by, among other things, incurring and paying legal costs to defend the Company and its officers against the Securities Class Action.

127.    investors and business from future customers who no longer trust the Company.

128.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

129.    Plaintiff, on behalf of Charles River, has no adequate remedy at law.


## SIXTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

130.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

131.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Charles River.

132.    The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to Charles River..

133.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

134.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

135.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Charles River, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Charles River;

(c)    Determining and awarding to Charles River the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Charles River and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Charles River and its shareholders from a repeat of the damaging events described herein;

(e)     Awarding Charles River restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 8,  2023

**RIGRODSKY LAW, P.A.**

By: */s/ Seth D. Rigrodsky*
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: gms@rl-legal.com
Email: hwm@rl-legal.com

*Counsel for Plaintiff*

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
        Email: pkim@rosenlegal.com
        Email: estone@rosenlegal.com